Jack F. Kitchin and Wilma H. Kitchin * v. Commissioner. Kitchin v. Commissioner
Docket Nos. 93733-93735.
United States Tax Court
T.C. Memo 1963-332; 1963 Tax Ct. Memo LEXIS 13; 22 T.C.M. (CCH) 1738; T.C.M. (RIA) 63332; December 23, 1963
*13 Fortescue W. Hopkins, 509 Mountain Trust Bldg., Roanoke, Va. and H. Clyde Pearson, for the petitioners. Donald P. Krainess and Charles R. Hembree, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Taxable
Docket
year
number
Petitioner
ended
Deficiency
93733
Jack F. Kitchin and
Wilma H. Kitchin
12/31/58
$ 8,490.18
93734
Kitchin Equipment
Company of Vir-
ginia, Inc.
3/31/59
20,354.80
93735
Motor Crane Serv-
ice Company, Inc.
3/31/59
5,105.55
$33,950.53
Petitioner Kitchin Equipment Company of Virginia, Inc., claims an overpayment of $794.74. The issues for decision are: (1) Whether payments received by each of the petitioners under certain contracts involving the furnishing of equipment for use of a contractor are includable in petitioners' income in the year accrued as rental receipts. (2) If the payments received by petitioners do not represent rentals received, are petitioners entitled to deductions in the taxable years here involved for depreciation on the *14 equipment for the period after the execution of the agreement under which the equipment was furnished to the construction contractor. Findings of Fact Some of the facts are stipulated and are found accordingly. Jack F. Kitchin and Wilma H. Kitchin, husband and wife residing in Norfolk, Virginia, filed a joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Richmond, Virginia. Kitchin Equipment Company of Virginia, Inc., a corporation (hereinafter referred to as Kitchin Equipment) and Motor Crane Service Company, Inc., a corporation (hereinafter referred to as Motor Crane) each filed its corporate income tax return for its fiscal year ended March 31, 1959, with the district director of internal revenue at Richmond, Virginia. During the year 1958 Jack F. Kitchin engaged in business under the name of Norfolk Contracting Company (hereinafter referred to as Norfolk) and was also the president and owner of all of the outstanding capital stock of Kitchin Equipment and Motor Crane. Norfolk, Kitchin Equipment, and Motor Crane each kept its books and computed and reported its taxable income on an accrual method of accounting. *15 Norfolk, Kitchin Equipment, and Motor Crane (sometimes hereinafter referred to collectively as petitioners) each had for several years prior to the taxable years here involved been engaged in the business of leasing construction equipment to contractors, most of the equipment leased being heavy construction equipment. Each of these companies leased equipment on either a bare rental basis or a fully operated basis. When equipment was leased on a fully operated basis, the company leasing the equipment would furnish the operators of the machines and would furnish all services in maintaining the machines leased. None of the three companies had any dealership franchises with any equipment manufacturer and none of them had in any way attempted to sell heavy equipment to contractors. Very often these companies would receive referrals for their rental business from equipment dealers and for this reason did not desire to sell equipment in competition with such dealers. From the latter part of 1955 throughout the year here involved, one of the principal customers of each of the three companies Norfolk, Kitchin Equipment, and Motor Crane, was M. W. Kellogg Company (hereinafter referred to *16 as Kellogg), a company engaged in the building of major construction projects. On February 21, 1958, Kellogg entered into an agreement with Kennecott Refining Corporation (hereinafter referred to as Kennecott) under which Kellogg as contractor agreed to construct a plant for Kennecott at Baltimore, Maryland. Under this agreement, Kellogg was to be reimbursed by Kennecott for the cost of the project and in addition was to receive a fixed fee. The construction agreement which Kellogg entered into with Kennecott provided among other things that insofar as possible, all equipment rental agreements by Kellogg with third parties should give Kennecott the option of straight rental or rental with option to purchase with rentals previously paid being applicable against the purchase price, the amount of purchase price to be mutually agreed upon with the lessor and approved by Kennecott's project manager. In the early summer of 1958 Kellogg advised Norfolk, Kitchin Equipment, and Motor Crane that it desired to lease equipment from each of them in connection with the construction of a plant for Kennecott at Baltimore. Kellogg further advised these three companies that under the terms of its *17 contract with Kennecott, it would be necessary that the lessors of equipment grant it an option to buy each item leased, applying rentals paid to a previously established purchase price which was referred to as a "recapture" price. At the time Kellogg requested petitioners to grant an option to it to purchase the equipment which it proposed to rent, petitioners had never entered into any type of leasing contract which granted to the lessee any right to purchase the equipment leased. After consideration of Kellogg's offer, petitioners agreed to the inclusion of the option in their rental agreement with Kellogg, for machinery to be used on work on the Kennecott plant but added the additional condition that Kellogg would reimburse petitioners for major maintenance expense incurred by petitioners during the leasing period with respect to such equipment as it exercised the option to buy, hereinafter sometimes referred to as recaptured equipment. Petitioners also had an understanding with Kellogg that no transportation costs would be charged for equipment except with respect to items of equipment returned by Kellogg to petitioners in a period of less than 6 months. In confirming in writing *18 their agreement with Kellogg to agree to the recapture clauses being included in leases of equipment to be executed with respect to equipment to be used by Kellogg on construction of the Kennecott plant, petitioners stated in part as follows: You are already aware, of course, that we are not equipment dealers and that we confine our equipment operations to rentals. Ordinarily, we would not be interested in granting purchase options in any of our rental agreements, but in view of our very pleasant relations in the past and our earnest desire to continue to serve you wherever we can, we have decided to go along on this job and include the recapture clause as requested. Therefore, on any equipment which you may decide to rent from us for this job, it may be understood that you will have the privilege of purchasing same at any time during the rental period and that 100% of any rentals paid will be applied to the purchase price. Of course, as previously explained to you, we would expect to be reimbursed for any maintenance expense we might have incurred during the rental period in the event you decide to exercise the recapture clause on any particular piece of equipment. Your exercising *19 the recapture clause would have the effect, actually, of converting a lease into an outright purchase at the inception of the so-called rental period, inasmuch as 100% of the rentals would apply to the recapture price, and we do not feel that we should be expected to bear any expense of maintenance on a piece of equipment that is, in effect, your own equipment. Thereafter each of the petitioners as lessor and Kellogg as lessee entered into equipment rental agreements for equipment to be used by Kellogg on work on the Kennecott plant. Each such agreement entered into was entitled, "Equipment Rental Agreement" and each contained 12 separate articles. Article 1 contained a description of the equipment to be rented; article 2 set forth the rental rates and basis providing for a schedule of rental rates for each of the items of equipment and rental rates on a monthly, weekly, or daily basis; article 3 dealt with payments providing for monthly payments of rental upon invoices to be rendered by lessor unless payment at more frequent intervals was agreed upon; article 4 provided for the condition of the equipment at the time of delivery to the job site and on the return of the equipment; *20 article 5 dealt with repairs due to normal wear and tear of the equipment and provided that such repairs would be for the account of the lessor; article 6 concerned operation and maintenance of the equipment and provided that if the lessor were to furnish any operating or maintenance service, the particular service and charge applicable were to be as stated in a schedule attached to the agreement and further provided for the operation and maintenance to be furnished by the lessor where the equipment was rented on a fully operated basis; article 7 dealt with rental terms, outlining the date the rental period began and the date it concluded and contained a provision that it was specifically understood that Kellogg made no representations or guarantee as to the length of the rental time or amount of rental which would accrue under the agreement for any item of equipment, it being the intent that the equipment was to be rented for as long as Kellogg required the use of the particular item in connection with the performance of the construction contract. Article 9 dealt with assignment of the agreement; article 10, with taxes and applicable laws; article 11, with notice to be given between *21 the parties to the agreement; and article 12 entitled, "Approval of Agreement" provided that the agreement would not be binding on Kellogg until approved by the party with whom Kellogg had entered into the construction contract but any such approval should not be construed as establishing any contractual relationship between the lessor and the party with whom Kellogg had entered into such construction contract. Beneath the signature of the petitioner entering into the contract with Kellogg as lessor and Kellogg as lessee and the approval as required on behalf of the party with whom Kellogg had the construction contract there appeared a line under which was printed and typed the following: Note: - Enter each schedule A issue hereunder Re. No. Type of equipment One hundred percent of all rental monies due and/or paid on this piece of equipment is to apply against the purchase price if recapture is desired at any time during rental period. All of the equipment leased by petitioners to Kellogg was on a monthly basis. The monthly rental and the recapture prices were negotiated by representatives of petitioners and Kellogg and were approved by Kennecott. In the early stages of the *22 Kennecott project Kellogg received competitive bids from other sources for equipment rental and used such bids as a guide in determining the rental rates it was willing to agree to with petitioner. The monthly rental rates as agreed to were generally about the same amounts which had been charged by petitioners to Kellogg on previous rentals to Kellogg by petitioners and represented the fair rental values of the equipment. The rental rates as determined were competitive with those offered by other equipment rental companies. In negotiating the recapture price petitioners sought as high a recapture price for the equipment as possible in order to discourage the exercise of the purchase option by Kellogg. Although the rental and recapture prices were subject to and were actually approved by Kennecott, Kennecott in no way participated in the negotiations between Kellogg and petitioners as to the amount of rentals or the recapture prices. Petitioners rendered monthly bills to Kellogg for charges for equipment used on the Kennecott project. Monthly accruals of rent were credited by each of the petitioners to an account entitled "Equipment Rental Income" in the same manner as rentals under *23 equipment rental agreements which did not contain a recapture clause. Rentals paid to each of the petitioners were deposited in that petitioner's bank account in the same manner as other receipts, and there was no restriction upon the disposition of such funds. Norfolk at the close of its taxable year ended December 31, 1958, and Kitchin Equipment and Motor Crane, each at the close of its taxable year ended March 31, 1959, by accounting entries transferred from its equipment rental income account appearing on its books to an account entitled "M. W. Kellogg Option Account" rentals previously accrued during the year and credited to equipment rental income. The amounts so transferred were the accruals during the year which had been credited to the account of units of equipment that were still being used by Kellogg at the close of the year under equipment rental agreements containing the recapture provision. The amount which each petitioner transferred from the equipment rental income account to the M. W. Kellogg option account was not included in its gross income for its taxable year in which rental accrued. The following schedule shows the amount that each petitioner transferred from *24 its equipment rental account to the suspense account entitled, "M. W. Kellogg Option Account": Taxable year
Petitioner
ended
Amount
Norfolk
Dec. 31, 1958
$10,966.66
Kitchin Equipment
Mar. 31, 1959
37,531.72
Motor Crane
Mar. 31, 1959
8,700.00
$57,198.38
The amounts as above set forth which were placed by the three petitioners in the suspense account entitled, "M. W. Kellogg Option Account" involved the rentals accrued with respect to 27 units of equipment. Of these 27 units of equipment, 14 units were ultimately returned to petitioners and 13 were recaptured by Kellogg for Kennecott. Kitchin Equipment and Motor Crane did not defer from gross income for the taxable year ended March 31, 1959, rentals in the amounts of $8,671.67 and $1,981.63, respectively, for five units of equipment which were returned by Kellogg after March 31, 1959. Kellogg billed Kennecott on a monthly basis for reimbursement of its costs in connection with the construction of the Kennecott plant. On such monthly statements all payments were itemized and supported by invoices. Rentals paid by Kellogg to petitioners were identified as chargeable to an account numbered 420 *25 entitled "Third Party Tool Rentals." When Kellogg recaptured equipment for Kennecott a billing was made to Kennecott for the recapture payment and the amount was identified on Kellogg's monthly statements as chargeable to an account numbered 415. Account No. 415 was established by Kellogg to separate recapture payments from rentals. Prior to the end of Norfolk's taxable year ended December 31, 1958, and the taxable year of Kitchin Equipment and Motor Crane ended March 31, 1959, neither petitioners nor Kellogg had information with respect to which, if any, of the 27 pieces of equipment the purchase option would be exercised. Whenever equipment was to be recaptured, Kennecott would advise Kellogg of its decision to recapture, and Kellogg would in turn advise petitioners. During the period from August 3, 1958, through March 18, 1959, Kitchin Equipment had placed for rental with Kellogg 27 pieces of equipment with respect to which rental payments were deferred. Four of these 27 pieces of equipment were the pieces heretofore referred to which were returned during April and May 1959 and rentals therefor were not deferred. On July 17, 1958, Norfolk delivered for rental to Kellogg one *26 piece of equipment and on August 1, 1958, two pieces of equipment, all three of which were still in use by Kellogg as of December 31, 1958. Motor Crane on October 1, 1958, rented one piece of equipment to Kellogg which was still in use by Kellogg on March 31, 1959, and with respect to which $8,700 of deferred rental was accrued from Kellogg to Motor Crane in Motor Crane's fiscal year ended March 31, 1959. On February 17, 1959, Motor Crane rented another piece of equipment to Kellogg which was returned to Motor Crane on August 24, 1959, but which did not involve a claimed deferral by Motor Crane in its fiscal year ended March 31, 1959. In addition to the 27 pieces of equipment with respect to which petitioners deferred rental income during the year in issue, during the period February 7, 1958, through January 4, 1960, petitioners leased 31 additional items of equipment to Kellogg, 27 of which were ultimately returned by Kellogg to petitioners and four were recaptured by Kellogg. During its taxable year ended December 31, 1958, Norfolk claimed depreciation deductions in the amount of $7,208.91 on equipment with respect to which rentals were deferred from income. Of the depreciation *27 so claimed $2,879.70 was applicable to the period from the date of the rental of the equipment by Norfolk to Kellogg to the end of the year 1958. During its fiscal year ended March 31, 1959 Kitchin Equipment deducted $20,429.45 as depreciation on equipment rented to Kellogg with respect to which rental receipts were deferred from income and Motor Crane deducted depreciation on such items of $8,266.63 in its similar fiscal year, the portion of such amounts which were allocable to the period from the date of the equipment rental to Kellogg to the end of the fiscal years ended March 31, 1959 being $10,588.59 and $4,133.32, respectively. Similar depreciation deductions were made by Kitchin Equipment and Motor Crane for equipment which was returned by Kellogg shortly after March 31, 1959 and with respect to which neither company deferred from gross income any rental accruals. The depreciation deducted by Kitchin Equipment on such items during its fiscal year ended March 31, 1959, was $4,370.37 of which $3,353.01 was applicable to the period after the rental to Kellogg and the amount of depreciation deduction by Motor Crane in its fiscal year ended March 1959 was $3,696 of which $308 *28 was applicable to the period after the rental of equipment to Kellogg. Respondent in his notice of deficiency increased the income of Jack F. Kitchin and Wilma H. Kitchin for the year ended December 31, 1958 by the amount of $10,966.66 and increased the reported income of Kitchin Equipment for its fiscal year ended March 31, 1959 by the amount of $37,531.72, and of Motor Crane for its fiscal year ended March 31, 1959 in the amount of $8,700, and in each instance explained the increase as representing "monies received under equipment rental agreements with M. W. Kellogg Company" during the taxable year and omitted from income. Petitioners contend that the deferred amounts were properly excluded from taxable income and that such amounts were properly held in a suspense account at the close of the fiscal year ended March 31, 1959 pending a subsequent determination as to whether such amounts were option payments or rental income, and that the taxable income of Kitchin Equipment and Motor Crane should be reduced by the amounts of $8.671.67 and $1,981.63 respectively, representing accrued rentals with respect to equipment returned shortly after the end of their fiscal year ended March 31, 1959, but *29 with respect to which no rentals were deferred. Opinion Petitioners take the position that under their agreement with Kellogg the accruals for equipment use do not constitute income until such time as the equipment is returned to them or the option to purchase the equipment is exercised by Kellogg. Petitioners argue that if the option to purchase the equipment is exercised, the amounts never constitute income except to the extent that the total payments exceed petitioners' basis of the equipment and that to this extent the amounts constitute capital gain. In support of their position petitioners rely upon cases involving payments for an option to purchase property such as , affd. (C.A. 4, 1938), certiorari denied ; (C.A. 5, 1944), affirming a Memorandum Opinion of this Court; and affd. (C.A. 3, 1961). Respondent takes the position that the amounts here involved were rental payments when accrued and therefore are includable in petitioners' income *30 when accrued. Respondent relies primarily on two cases involving payments under lease contracts with options to purchase, , affd. (C.A. 6, 1949); and . The facts in the instant case are similar to those in , and Petitioners contend that the Lester case is distinguishable from the instant case in that the taxpayer in the Lester case both sold and leased equipment whereas petitioners herein only leased equipment except for instances in which Kellogg exercised its option to purchase. The issue in the Lester case dealt only with receipts from that taxpayer's agreements to lease equipment with purchase options or understandings. We do not consider that there is any substantive distinction in the facts in the Lester case and the instant case. Petitioners' primary contention is that the Lester case and the Gilken Corporation case are incorrectly decided and in conflict with our opinions in , and We *31 do not agree with petitioners' contention. In The Dill Company case, as in , the amount which we held not to be includable in income in the year received was paid for an option to purchase property and was to be credited against the purchase price if the option were exercised, and if the option terminated without being exercised was to be retained by the grantor of the option. In , the sole purpose of the payment was for the option. In The Dill Company case, the payment served as consideration for the extension of a licensing agreement for an additional 5 years as well as for an option to purchase the property. In The Dill Company case, we held that inasmuch as the payment there involved was intended as a credit on the purchase price of the property in the event the option was exercised, it was not includable in income until such time as the option was exercised or expired since until this time it could not be determined whether the amount would constitute ordinary income or capital gain from the sale of the property. Regular royalty payments were being received by the taxpayer in The *32 Dill Company case for the use of the property. The payments were not in controversy since they were being included in income by the taxpayer as royalty payments. There is no indication in The Dill Company case that the regular royalty payments would be credited to the purchase price should the option to purchase be exercised. In the instant case the payments which Kellogg was making to petitioners were for use of the equipment. This was the sole purpose of the payments at the time they were made. If the option to purchase were not exercised the payments here involved would never serve any purpose except as rentals for use of machinery. Here as in , and , the character of the rental payments had not changed by the end of the taxable years in issue. At the end of petitioners' taxable years here in issue Kellogg had not exercised its option to purchase the equipment. The differences in the facts distinguish the Gilken Corporation case and Earl L. Lester case from The Dill Company and Virginia Iron Coal & Coke Co. cases. The instant case is not distinguishable from , and our *33 holding in that case is controlling here. Although the primary arguments of the parties center on the correctness of our decisions in , because of the close factual similarity of that case and the instant case, each party cites and relies upon numerous cases dealing with whether amounts paid under contracts providing for lease of property with option to purchase are rental payments or payments on a purchase price. [1] While the various cases discussed are factually distinguishable from the instant case and therefore not strictly in point on the issue here involved, the general import of these cases is that the primary purpose of the payment is to control its nature for tax purposes. The primary purpose of the payment is to be determined from the agreement with respect to the payment and other relevant facts. *34 To the extent that these cases are applicable to the factual situation in the instant case, they support our conclusion that the rental accruals to petitioners under the facts in the instant case were for rentals. Clearly here the primary purpose of the payments was as rentals for the use of property. The agreed recapture price of the equipment was not a nominal price. There was no fixed amount of rent to be paid which would equal or closely approach the recapture price. There was no fixed period of rental but the rental could terminate at Kellogg's discretion. We recognize as petitioners point out, that in those instances where in a subsequent year, Kellogg exercised the option and purchased the equipment that the amount paid at the time of the purchase might not be representative of the then value of the equipment because of the crediting of the prior rental payments on the purchase price. However, as respondent points out, there is no evidence in this record to show that this in fact is the situation. Petitioners made every effort to set the recapture price high to discourage the purchase of the equipment. Insofar as this record shows, it may be that the amount which would be *35 paid when the option was exercised would in fact represent the fair purchase price of the equipment in its then condition. Petitioners call attention to the fact that the option might be exercised when only the last rental payment to complete the amount necessary to pay the predetermined recapture price remained to be paid and argue that this of itself proves that the payment made when the option is exercised would not represent the fair market value of the equipment at the date of the exercise of the option. We do not agree with petitioners that it necessarily follows that equipment which has been used for a period sufficient for the rental payments to equal the recapture price would be worth more than the last payment at the date the option was exercised. However, even if we could assume, as petitioners argue we should, that the recapture price after allowance for prior rental payments would not in all instances equal the fair market value of the equipment at the date the option was exercised, this fact would not change the nature of the rental payments during the years here involved. We sustain respondent in his treatment of the rental *36 accruals as income to petitioners in the years of their accrual. In view of our holding that the rentals accrued under petitioners' agreements with Kellogg constitute income in the year of their accrual, it is unnecessary to pass upon respondent's alternative contention with respect to petitioners' depreciation deduction. Decision will be entered for respondent. Footnotes
*. a1 Proceedings of the following petitioners are consolidated herewith: Kitchen Equipment Company of Virginia, Inc., Docket No. 93734, and Motor Crane Service Company, Inc., Docket No 93735.↩
1. Among the cases cited by the parties are the following holding amounts not to be deductible as rents because the taxpayer was acquiring an equity in the property: ; ; , modified (C.A. 9, 1959); ; and affd. (C.A. 9, 1956); and the following cases holding amounts paid under lease with option to purchase agreement to be deductible as rental payments; (C.A. 5, 1952) reversing a Memorandum Opinion of this Court; (C.A. 7, 1956), reversing ; and (C.A. 8, 1959), reversing a Memorandum Opinion of this Court. The parties also cite cases involving whether contracts in form leases on property with option to purchase are in substance sales contracts so that the recipient of the payments should be considered to have received gain from the sale of property and not rental income. Among the cases cited by the parties involving this issue are: ; ; (C.A. 7, 1941), reversing ; (C.A. 9, 1955), reversing a Memorandum Opinion of this Court; and (C.A. 9, 1958).↩